**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                               )
LAURA M. SCALONE-FINTON,       )
                               )
        Plaintiff,             )
                               )
v.                             )
                               )      No. 1:21-cv-11792-JEK
FALMOUTH PUBLIC SCHOOLS,       )
MARY GANS, ALAN KAZARIAN, and  )
JOANY SANTA,                   )
                               )
        Defendants.            )
_____)
```

**MEMORANDUM AND ORDER ON**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**KOBICK, J.**

This case arises from a series of workplace conflicts between three employees at Falmouth High School: plaintiff Laura Scalone-Finton, a School Adjustment Counselor; defendant Mary Gans, the Principal; and defendant Alan Kazarian, the Director of Guidance. Starting in the 2017-2018 school year, Finton raised complaints concerning her workload and the resources allocated to minority students and students with disabilities at Falmouth High School. Defendant Falmouth Public Schools ("FPS") addressed some of these concerns, but Finton continued to assert that the school was underserving its disabled and minority students.[1]

In September 2019, after several interactions with Gans and Kazarian, Finton filed a harassment complaint with defendant Dr. Joany Santa, the Human Resources Director for FPS, and notified Dr. Santa that she had been diagnosed with situational stress disorder. Finton was

---

[1] The plaintiff refers to her last name as "Finton" rather than "Scalone-Finton." The Court follows her lead.

1

temporarily transferred to a different school while Dr. Santa investigated her complaint. In October 2019, Dr. Santa informed Finton that the investigation did not corroborate her claims and that she would be required to return to work at Falmouth High School. After Finton objected, FPS allowed her to remain at the other school through December 2019, while she appealed Dr. Santa's conclusions. When those conclusions were affirmed, Finton again represented that she could not work in the same school as Gans and Kazarian, and thus commenced a series of medical leaves of absence that lasted through June 2020. After several months of unsuccessful negotiations regarding the conditions of Finton's return to work, Finton ceased responding to FPS's letters, and her employment was terminated in October 2020.

Finton alleges that the defendants discriminated and retaliated against her because of her disabilities and her advocacy for disabled and minority students, in violation of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, M.G.L. c. 151B, § 4, the First Amendment, and Massachusetts common law protections for at-will employees. Pending before the Court is the defendants' motion for summary judgment on all counts. That motion will be granted because, as explained below, no reasonable jury could conclude, on the record before the Court and with all factual inferences drawn in her favor, that Finton was exposed to a hostile work environment or that she was terminated because of her disabilities or her advocacy for disabled and minority students.

## BACKGROUND

The following facts are either undisputed or recounted in the light most favorable to Finton, the non-moving party, where supported by record evidence. *See Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023).

I.      **Factual Background.**

Finton was employed by Falmouth Public Schools at Falmouth High School from 2007 until 2020. ECF 57, ¶¶ 4-7, 220. She served as a guidance counselor from 2007 to 2011 and as a school adjustment counselor from 2011 until 2020. *Id.* School adjustment counselors work with students who have individualized education plans ("IEPs"); provide mental health services, intervention and crisis response, and individual and group counseling; and serve as members of interdisciplinary teams to assess student needs. *Id.* ¶¶ 8-9. During the time period relevant to this case, Gans was the Principal of Falmouth High School, Kazarian was the Director of Guidance at Falmouth High School, and Dr. Santa was the Human Resources Director for Falmouth Public Schools. *Id.* ¶ 2.

A.      Finton's Early Years at Falmouth High School.

From 2007 to 2011, while she was working as a guidance counselor, Finton reported directly to Kazarian. *Id.* ¶ 51. Kazarian mistreated her and many of the other employees who reported to him by falling asleep at meetings; yelling at, embarrassing, and talking down to co-workers; questioning their actions in front of their colleagues; being unsupportive; and telling Finton she "should get a job at Kmart if [she] didn't like the paperwork." *Id.* ¶¶ 51-55. From 2011 to 2018, Finton no longer reported to Kazarian, and their relationship improved. *Id.* ¶¶ 57-58.

Gans became the Principal of Falmouth High School in 2015. *Id.* ¶ 59. Finton described the work environment after Gans's hiring as "toxic." *Id.* ¶¶ 60-62, 70-75. Gans was Finton's direct supervisor from 2015 until 2019, and she gave Finton consistently positive performance reviews during that time. *Id.* ¶¶ 66-68.

Falmouth High School holds weekly "coordination meetings" to discuss students in need and students of concern. *Id.* ¶ 10. The principal, assistant principals, guidance director, school

psychologist, school nurse, guidance counselors, school adjustment counselors, and the special education building administrator attend these meetings. *Id.* At some of the meetings, with Gans and Kazarian present, Finton advocated for minority students and students with disabilities. *Id.* ¶¶ 11, 69.

    B.    <u>The 2017-2018 and 2018-2019 School Years.</u>

Several events transpired during the 2017-2018 and 2018-2019 school years that bear on Finton's claims.

    1.    *Finton's Proposed Wellness Center.*

First, in 2018, Gans approved Finton's proposal to create a "Wellness Center" at Falmouth High School, but the proposed center never opened.

Falmouth High School has long provided specialized services to students with special needs and emotional difficulties. *Id.* ¶ 12. One program, called the Connect Program, is available to students with serious social and emotional disabilities who are on IEPs. *Id.* ¶¶ 13-14, 19. Another program, called the Bridge Program, is available to students who have an extended absence from school, typically due to hospitalization. *Id.* ¶ 24. During their extended absence, some Bridge Program students participate in home or hospital tutoring. *Id.* ¶¶ 25-26. Under Falmouth High School's protocol, to be eligible for the Bridge Program, a student must be submitted for admission to, and considered by, the administration at a weekly coordination meeting. *Id.* ¶¶ 28-29.

Finton understood the Bridge Program to disproportionately serve wealthier and white students, not the students on her caseload, who were disproportionately low-income students of color. *Id.* ¶¶ 31-33. She also understood that students in the Bridge Program received more resources than her students, and that students in the Bridge and Connect Programs graduated at higher rates than her students. *Id.* ¶¶ 34-35. Thus, in March 2018, Finton proposed a new program,

called the Wellness Center, which was intended to help all students with emotional and developmental challenges. *Id.* ¶¶ 37, 43. In her draft proposal for the Wellness Center, submitted in August 2018, Finton stated that the center's purpose was to "provide students with an opportunity to develop healthy coping skills and strategies for self-care." *Id.* ¶¶ 38-40.

Gans approved the establishment of the Wellness Center in the spring of 2018. *Id.* ¶ 44; ECF 72-1, at 133, Day One.[2] Gans and Finton expected that Finton would work on implementing the center from 2018 to 2020, with the two periodically checking in on her progress. ECF 57, ¶ 45. Finton planned to open the Wellness Center in the 2019-2020 school year, and Gans wrote in Finton's June 2019 evaluation that Finton had made "significant progress" toward that goal. *Id.* ¶¶ 46-47. Before opening the center, however, Finton had to identify a space, connect with tutors, and meet with the Director of Student Services. *Id.* ¶¶ 48-49. She did not accomplish all of these tasks and, ultimately, the Wellness Center did not open. *Id.* ¶¶ 48-50.

        2.    *Heavy Workload and the January 2019 Grievance.*

Second, Finton's heavy workload during the 2017-2018 school year and the first half of the 2018-2019 school year led her to submit a grievance to her union, the Massachusetts Teachers Association ("MTA").

At the beginning of the 2017-2018 year, Falmouth Public Schools and Gans approved Finton's request to reduce her hours to 80%. ECF 67, at 13, ¶ 3. Finton expressed to Gans that she was experiencing symptoms of anxiety, but she did not submit any medical documentation indicating that she had been diagnosed with an anxiety disorder. ECF 57-2, at 90-91, Day One.[3]

---

[2] Exhibit 2 to the defendants' statement of material facts is the transcript of Finton's deposition taken on two separate days. Because the pagination restarts on the second day, the Court will refer to them as "Day One" and "Day Two."

[3] The defendants originally filed Finton's entire deposition under seal, ECF 57-2, but they failed to demonstrate good cause for doing so, as required to overcome the presumption of public

During the 2017-2018 and 2018-2019 school years, another school adjustment counselor frequently called out sick and took medical leave, which forced Finton to work additional hours. ECF 57, ¶¶ 64-65; ECF 67, ¶ 64.

Knowing that Finton was feeling overwhelmed, stressed, and anxious due to the increased workload, Kazarian began stopping by Finton's office in the fall of 2018 for what he called "Wellness Checks." ECF 67, at 13, ¶¶ 6-7. He would ask Finton how she was doing. *Id.* ¶ 7. When Finton informed Kazarian that Gans refused to hire a substitute or otherwise lighten her workload, he minimized her experiences, saying she was "ridiculous" and "emotional." *Id.* Kazarian testified that he was frustrated that Finton was "sad, depressed, [and] anxious" during the 2018-2019 school year, explaining that "[i]t was frustrating to see [Finton] frustrated and it was frustrating just because of the situation of having one less counselor to help service our students." ECF 82, at 143-44; *see* ECF 67, at 14, ¶ 9.

In January 2019, Finton filed a grievance with her union concerning her excess workload. ECF 57, ¶ 65; ECF 67, at 14, ¶ 8 ("January 2019 grievance"). She also raised the lack of services for students with disabilities in the grievance process. ECF 67, at 14, ¶ 8; ECF 72-4, at 1.[4] As a

_____

access to judicial records, *see* ECF 62, at 1-3 (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978); *United States v. Kravetz*, 706 F.3d 47, 59 (1st Cir. 2013)). The Court therefore ordered the defendants to file a public version of the deposition, proposing narrow redactions where appropriate. ECF 62, at 3. The defendants filed a public version of Finton's deposition with redactions, but they excised significant portions of the deposition before doing so. *See* ECF 72-1. The Court cites to the sealed version of Finton's deposition here because the cited pages are not included in the publicly accessible document, and because the factual content in this sentence is not the sort of sensitive information that warrants narrow redactions. *See In re Providence J. Co., Inc.*, 293 F.3d 1, 9-10 (1st Cir. 2002) (the common-law right of public access to judicial records "extends to 'materials on which a court relies in determining the litigants' substantive rights'" (quoting *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 13 (1st Cir. 1986))).

[4] Citing the grievance documents, Finton's statement of material facts claims that she also brought up the Wellness Center, which she described as being designed for disabled and minority student populations, during the grievance process. ECF 67, at 14, ¶ 8. There is no support for this allegation in the grievance documents themselves. *See generally* ECF 57-9, 72-4.

result of the grievance, a substitute school adjustment counselor was hired in April 2019, and Kazarian once again became Finton's supervisor. ECF 57, ¶ 66; ECF 57-1, at 5; ECF 67, at 14, ¶ 10. At that point, Finton's relationship with Kazarian worsened. ECF 57, ¶ 66. After the grievance, Gans barely spoke to Finton and gave new referrals to the substitute school adjustment counselor. ECF 67, at 14, ¶ 10.

### 3. *New England Association of Schools and Colleges Accreditation Process.*

Third, Finton participated in a review of Falmouth High School by the New England Association of Schools and Colleges ("NEASC"), an independent non-profit organization that, among other things, accredits schools. ECF 57, ¶¶ 115-17.

NEASC's review of Falmouth High School happened during the 2018-2019 school year. *Id.* ¶ 116. Finton co-chaired a subcommittee that provided data and feedback to a steering committee, which in turn drafted and submitted a report to NEASC. *Id.* ¶¶ 117-19, 121; ECF 67, ¶ 117. Tom McManamon, an assistant principal, was on the steering committee. ECF 57, ¶ 120. Finton helped coordinate a meeting between NEASC and a group of Falmouth High School students whom she identified as disengaged and marginalized. *Id.* ¶¶ 124, 126. McManamon did not bring the students to the initial meeting as agreed, but the meeting was rescheduled and took place the next day. *Id.* ¶¶ 125-26. Gans told Finton afterward that the "entire English department hated" her for coordinating the meeting. *Id.* ¶ 127.[5]

NEASC issued a report in April 2019. ECF 67, at 14-15, ¶ 12. The report stated, among other things, that Falmouth High School was failing to meet the needs of certain subgroups, including students who were "struggling with cultural differences, language and learning issues,

---

[5] The timing of these events is not clear from Finton's deposition or from the parties' statements of material facts, but it appears that these events took place during April 2019. ECF 83, at 173.

as well as issues of trauma who [were] not having a positive experience in school." *Id.* All of the data that Finton's subcommittee submitted to the steering committee was included in the NEASC report. ECF 57, ¶ 123.

### 4.   *Finton's Situational Stress Disorder Diagnosis.*

In April 2019, Finton's physician, Dr. Michael Smith, diagnosed her with situational stress disorder. *Id.* ¶ 129. In July 2019, Finton requested a letter from Dr. Smith reflecting a post-traumatic stress disorder ("PTSD") diagnosis, but he declined to provide the letter because Finton had not, at that time, been diagnosed with PTSD, and she would need an appointment to determine whether she met the criteria for that condition. *Id.* ¶¶ 130-32. Finton did not schedule an appointment and returned to work in August 2019. *Id.* ¶¶ 133-34.

Also in August 2019, Finton met with Lori Duerr, Superintendent of Falmouth Public Schools, "to discuss the inequities for the students she serviced and revie[w] data that supported these observations." ECF 67, at 15, ¶ 13. Gans did not learn of this meeting with Duerr until September 23, 2019. ECF 83, at 147-49. Gans testified that Duerr told her that Finton was having emotional issues but did not further describe the substance of their meeting. *Id.*

### C.   The 2019-2020 School Year.

### 1.   *September 2019 Meetings.*

During the 2019-2020 school year, following a series of interactions with Gans and Kazarian in September 2019, Finton filed a harassment complaint.

On September 12, Gans accused Finton of discussing the Bridge Program with the parents of a student without first submitting to the administration the student's request to participate in the program. ECF 57, ¶¶ 135-39. On September 17, Kazarian raised his voice at Finton during two meetings, spoke to her in a "hostile manner," and during one of the meetings, "began yelling" and

"rolling his eyes and waving his hands in the air." *Id.* ¶¶ 140-41. The next day, September 18, Kazarian entered Finton's office, told her intern to leave, and "blocked the door with his hand on the door handle." *Id.* ¶ 142. He told Finton that her negative attitude in department meetings would need to stop, that he would have to put her on a performance improvement plan, and that her colleagues felt uncomfortable around her. *Id.* During the conversation, Finton twice asked Kazarian to leave, but he ignored her. *Id.* Finton does not allege that his reprimand was unfounded.

Finally, on September 19, during a coordination meeting, Gans became visibly upset that Finton had provided Bridge Program forms to the student's parents, in contravention of the school's protocol that required student candidates for the Bridge Program to first be considered at coordination meetings. *Id.* ¶¶ 29, 143. Gans reprimanded Finton in front of her colleagues. *Id.* ¶ 143. When Finton claimed to have been acting with Kazarian's approval, Kazarian denied giving her approval and confirmed that Finton had given the forms. *Id.*

### 2.   *Finton's September 2019 Complaint and the Subsequent Investigation.*

On September 20, 2019, Dr. Smith wrote a letter stating that Finton "has been diagnosed with acute situational stress disorder due to hostile work environment" and that he was "advised that she is working with her union representation to create a safe working environment." *Id.* ¶ 145. The letter was not immediately given to the school. *Id.* ¶ 151.

On September 23, 2019, Lori Andrade, President of the MTA, requested that Dr. Santa meet with Finton. *Id.* ¶ 146. Dr. Santa agreed, and Finton met with Dr. Santa, Andrade, Director of Student Services Joan Woodward, and MTA representative Kim Hoffman later that day. *Id.* ¶¶ 146-47. At the meeting, Finton alleged that she had been targeted and harassed by Gans and Kazarian. ECF 72-9, at 1. She also "screamed" at Dr. Santa and said that she was having "a panic attack" and becoming "dysregulated." ECF 57, ¶ 148. When Finton asked Dr. Santa to pause the

meeting, Dr. Santa refused. *Id.* During the meeting, Finton was directed to work at a different school, the Morse Pond School, as an interim safety measure while the human resources team investigated her allegations of harassment. *Id.* ¶ 149. Shortly after the September 23 meeting, Dr. Santa opened an investigation into Finton's allegations, and Finton provided Dr. Santa with Dr. Smith's September 20 note identifying Finton's acute situational stress disorder diagnosis. *Id.* ¶¶ 150-51.

During the weeks that followed, Finton provided Dr. Santa a written statement memorializing her allegations of harassment, and Dr. Santa interviewed fourteen witnesses, seven of whom Finton had requested to be interviewed. *Id.* ¶¶ 153-54. Dr. Santa then wrote to tell Finton that the investigation had concluded and that she had scheduled a meeting for October 18, 2019 to discuss the outcome. *Id.* ¶¶ 155-57. Finton responded, "I welcome a meeting with you and [Andrade] to create a plan for my safe return to work given my specific needs and documented medical diagnosis." *Id.* ¶ 158. Dr. Santa responded, "We are not aware of any medical restrictions. If you have a doctor's note putting you out of work or requiring assistance, please forward that to me." *Id.* ¶ 159.

At the October 18 meeting, Dr. Santa informed Finton, with Andrade in attendance, that her investigation did not corroborate Finton's harassment allegations. *Id.* ¶¶ 160-61. Dr. Santa also provided Finton with a letter detailing the investigation and findings. *Id.* Specifically, Dr. Santa found that while "there was no targeting, unprofessional or disrespectful behavior on the part of" Gans, Kazarian, and another Falmouth High School employee, there were "areas in need of attention." *Id.* ¶ 161. She recommended that Kazarian be retrained, that Gans supervise his retraining, and that Finton have "4-6 self-care sessions" with the employee assistance program ("EAP") and a transition meeting before returning to work. *Id.* Dr. Santa's letter concluded that:

It is unrealistic to expect the team to go back to work harmoniously in the same environment without being intentional about helping the parties avoid future divisive behavior. During the transition meeting, we can discuss steps toward putting the matter behind us constructively and ways to improve communication and collegial relationships. I believe this is attainable as all involved felt that the individuals are all valuable and capable team members and expressed wanting to get back to a place of harmony. The Human Resources Office will schedule the transition meeting(s), retraining, facilitate EAP interface, and regularly check-in for progress.

*Id.* At the meeting, Finton requested an internal transfer within Falmouth Public Schools to work in a different building. *Id.* ¶ 162. Later that day, after the meeting, Finton sought an intake at Independence House, a domestic violence and sexual assault counseling and advocacy organization. *Id.* ¶ 163. Finton testified that while she was not sexually or physically abused, she chose to seek treatment there based on "workplace violence," because she felt "emotionally and psychologically abused" by her supervisors. *Id.* ¶ 164.

In an October 22, 2019 email, Dr. Santa denied Finton's request for an internal transfer because there were no open positions available within the school district. *Id.* ¶ 165. She set Monday, October 28, 2019 as Finton's return date, and requested that Finton inform her when she wanted to access the school during the week of October 22, so that she could avoid interactions with Kazarian and Gans. *Id.* Dr. Santa also scheduled transition meetings for October 25, 28, and 29 with the various parties. *Id.*

       3.    *Events From Late October to December 2019.*

On October 24, 2019, Robert Lawless, an attorney representing Finton, contacted Falmouth Public Schools to inform them of his representation and of Finton's intent to appeal Dr. Santa's investigatory finding of no harassment. *Id.* ¶ 166. His letter did not mention that Finton had a disability or request an accommodation. *Id.* ¶ 167. Finton did not, however, immediately file an appeal. *Id.* ¶ 182.

11

On October 25, 2019, Finton sent Dr. Santa an email stating that she had met with "providers . . . to establish a plan for [her] well-being." *Id.* ¶ 168. She also submitted a letter from Dr. Smith stating that, due to her condition, "[s]he is unable to meet with . . . or speak to coworkers at this time," because "meetings with her supervisors/coworkers involved in the current investigation are resulting in severe anxiety and physiological symptoms like chest pain and insomnia with panic attacks," *id.* ¶ 169, along with a letter from Independence House stating that she had completed the intake process, *id.* ¶ 170. Dr. Santa cancelled the scheduled transition meetings but noted in a reply email that no plan of care had been provided. *Id.* ¶ 171.

On October 28, 2019, Falmouth Public Schools indicated that Finton could continue to work at Morse Pond School, and Finton did work there through December 2019. *Id.* ¶¶ 173-74. Finton testified that, several times during the fall of 2019, she made accommodation requests to Dr. Santa, but that Dr. Santa repeatedly requested documentation or was otherwise unhelpful. *Id.* ¶¶ 172-76. Finton remembers "being told no" when she asked to write an accommodation plan for herself, noting that she "wrote these plans all the time for kids." *Id.* ¶ 176. She testified that she proposed to Dr. Santa that she would write herself a plan, engage in exposure therapy, and have a place she could retreat to at work. ECF 72-1, at 43-48, Day Two. But she also testified that "[t]he specifics of the accommodation plan were never put in writing." *Id.* at 44.

On November 26, 2019, Lawless sent Falmouth Public Schools a letter, on behalf of Finton, that proposed a settlement of Finton's harassment claim with a number of terms. ECF 57, ¶¶ 178-80; ECF 72-13, at 1. Finton proposed: (1) that she be appointed to a newly created position with the title "Director of Social Emotional Learning," supervised by the assistant superintendent, and with a work station at the school district's central office; (2) that Falmouth High School open her proposed Wellness Center and staff it with two new full-time positions; (3) that she have 3-6

mediation sessions with Kazarian and Gans, and 3 sessions with another employee who is not a party to this lawsuit; (4) that before the mediation sessions, she receive "at least 3-5 sessions entering [Falmouth High School] with a support person when none of the three people named in her harassment claim are in the building"; (5) that she no longer have any direct verbal communication with Kazarian and that she never be alone with him at a meeting; and (6) that, once work resumed, she have a designated "place she [could] go if she [was] feeling triggered or unsafe and an individual with whom she [could] speak." ECF 57, ¶¶ 178-80; ECF 72-13, at 4-6.

Superintendent Duerr denied these proposals as untenable on November 29, 2019. ECF 57, ¶ 181. Duerr did not give reasons for the rejections, but thanked Finton for attempting to resolve the issue outside the formal harassment investigation and noted that she supported the creation of a Wellness Center and mediation between Finton and the other employees, but not with the caveats and restrictions requested by Finton. ECF 57-25, at 1-2. Counsel for the district also cancelled a planned December 3, 2019 meeting, at which the parties were scheduled to discuss the proposal, because the parties were too far apart for the discussion to be productive at that time. *Id.*

### 4.    *Finton's Appeal of the Investigatory Findings and Removal from Payroll.*

Finton appealed Dr. Santa's finding of no harassment on December 13, 2019. ECF 57, ¶ 182. While the appeal was pending, Finton met with Duerr, counsel for Falmouth Public Schools, and Finton's counsel to request a workplace safety accommodation. *Id.* ¶ 184. Her request was denied because she had not been physically assaulted in the workplace. *Id.* Finton did not in that meeting request an accommodation based on a disability. *Id.* On December 20, 2019, Finton sent Dr. Smith an email informing him that she would likely have to request leave under the Family Medical Leave Act ("FMLA") if she did not prevail in the appeal. *Id.* ¶ 185.

On December 30, 2019, Falmouth Public Schools notified Finton that it had upheld Dr. Santa's finding that Finton had not been harassed. *Id.* ¶ 186. The school district directed Finton to return to her position by January 6, 2020. *Id.* The next day, Finton wrote to Dr. Smith, requesting that he "updat[e] the previously written letter that I can't be around my supervisors until cleared by you." *Id.* ¶ 187. On January 10, 2020, Dr. Smith submitted FMLA paperwork stating that Finton could not perform her job functions. *Id.* ¶ 189. He reported that Finton "experiences acute symptoms of panic, insomnia, hypervigilance, and severe Gastroesophageal reflux" ("GERD"), and that her "symptoms are consistent with a diagnosis of Post Traumatic Stress Disorder." ECF 57-3, at 2; ECF 57, ¶ 190. The FMLA paperwork did not specify a timeframe for Finton's absence. ECF 57-3, at 3; ECF 57, ¶ 191. Finton testified that her primary concern at that time was working in proximity to Gans and Kazarian, and that she had never disclosed to Gans or Kazarian that she suffered from PTSD or GERD. ECF 57, ¶¶ 193, 226-28.

In March 2020, after being notified that her FMLA time had run out, Finton wrote to Dr. Smith requesting a letter that "state[s] that I will continue to be ill in the same way for an undetermined amount of time," and "that we will re-evaluate my condition in one month from this request." *Id.* ¶¶ 194-95. Dr. Smith agreed and wrote a letter on March 25, 2020, stating that, due to her "uncontrolled anxiety," Finton "is unable to work on site or remotely . . . and while a treatment plan is in place there is no future date at this time that she is expected to be able to return from work." *Id.* ¶¶ 196-97. On April 3, 2020, Finton requested medical leave until August 20, 2020, including Dr. Smith's March 25 letter in support. *Id.* ¶ 198. On April 15, 2020, she was granted unpaid leave until June 26, 2020. *Id.* ¶¶ 200-01. On April 3, 2020, Finton also filed a complaint with the Massachusetts Commission Against Discrimination. *Id.* ¶ 199.

14

On June 10, 2020, Finton wrote to Dr. Smith requesting an updated letter. *Id.* ¶ 202. After meeting with Dr. Smith via telephone on June 19, 2020, Finton was diagnosed for the first time with PTSD. *Id.* ¶ 203. Dr. Smith wrote a letter informing Falmouth Public Schools that, as a result of Finton's PTSD and situational anxiety disorder, she was "unable to enter the workplace or to be in the presence of her supervisors either in the workplace or remotely." *Id.* ¶ 204.

On July 2, 2020, counsel for Falmouth Public Schools wrote to Finton's current attorney to acknowledge Dr. Smith's letter, request information about Finton's anticipated return date, and inform her that an indefinite absence was not tenable. *Id.* ¶¶ 205-06. Finton's counsel replied that, because there were no changes in the work environment, Finton would not be able to return for the 2020-2021 school year. *Id.* ¶ 208. The school district's counsel replied by letter, asking Finton's counsel to provide information regarding what changes to the workplace would allow Finton to return during the 2020-2021 school year. *Id.* ¶ 210. After negotiating a process for Finton to pick up her personal property from the school, Finton's counsel inquired if a transfer was out of the question or if there was some way to prevent contact with Gans and Kazarian. *Id.* ¶¶ 211-13. Counsel for Falmouth Public Schools replied, taking the position that (1) up until this request, the investigation had concerned harassment, not a request for a disability accommodation; and (2) neither a transfer nor a lack of contact with her supervisors was a reasonable accommodation, but that the district would consider proposals for reasonable accommodations. *Id.* ¶ 214. Finton and her counsel did not respond to this letter. *Id.* ¶ 215.

On September 12, 2020, counsel for Falmouth Public Schools wrote to Finton's counsel to request a response, reiterate the district's position on accommodations, and express the district's understanding that Finton did not intend to return to work for the 2020-2021 school year, given the "impossibility" of the district granting her requested accommodations. *Id.* ¶ 216. There was no

response. *Id.* ¶ 217. On October 7, 2020, a final letter was sent, reiterating the district's positions and setting a final deadline for Finton's termination. *Id.* ¶ 218. Again there was no response, and Finton was removed from the payroll on October 16, 2020. *Id.* ¶¶ 219-20. Finton testified she had no knowledge of these exchanges with her counsel. *Id.* ¶ 221.

## II.   <u>Procedural Background.</u>

Finton filed this lawsuit against Falmouth Public Schools, Gans, Kazarian, and Dr. Santa in November 2021. ECF 1. Her complaint asserts the following claims: (1) a First Amendment claim under 42 U.S.C. § 1983, alleging that she was terminated in retaliation for her advocacy for students with disabilities (Count II); (2) claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and M.G.L. c. 151B, § 4(16), alleging that the defendants discriminated against her because of her disability, created a hostile work environment because of her disability, and failed to provide a reasonable accommodation for her disability (Counts I, III, and IV); (3) claims under the ADA, 42 U.S.C. § 12203, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and M.G.L. c. 151B, § 4(4), alleging that the defendants retaliated against her by terminating her employment and creating a hostile work environment (Counts I, III, and V); and (4) a wrongful termination claim against Falmouth Public Schools (Count VI).[6] ECF 1, ¶¶ 70-109. After discovery, the defendants moved for summary judgment on all claims.

---

[6] Finton's complaint also alleged that the defendants discriminated against her because of her association with students with disabilities, in violation of the ADA and M.G.L. c. 151B, § 4(16). *See* ECF 1, ¶¶ 90, 98. The defendants objected to this associational theory of liability in their motion for summary judgment. ECF 56, at 15-16; ECF 79, at 4-5. Finton failed to address their arguments either in her opposition brief or during the motion hearing, thus waiving the associational theory of liability under either statute.

## STANDARD OF REVIEW

Summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). To prevail, the moving party must show that "there is no factual determination which a 'rational factfinder' could make as to the 'existence or nonexistence' of a fact that 'has the potential to change the outcome of the suit.'" *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4-5 (1st Cir. 2010)). Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant," but "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023) (quoting *Lahens v. AT&T Mobility Puerto Rico, Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)). The non-moving party may not simply "rest upon mere allegation or denials," but instead must "present affirmative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

## DISCUSSION

### I.   First Amendment Claim.

Finton contends in her first claim that, in violation of the First Amendment, she was terminated from her job at Falmouth Public Schools in retaliation for her protected speech. "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). But because

17

the efficient provision of public services depends in part on whether employees' words and actions are ascribed to the government, "public employees' First Amendment rights 'are not absolute.'" *McRae v. Mattos*, 106 F.4th 122, 132 (1st Cir. 2024) (quoting *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007)).

The Supreme Court has developed a multi-part test for assessing whether an adverse employment action has infringed upon a public employee's First Amendment speech rights. The test strives "both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions." *Garcetti*, 547 U.S. at 420. First, a court must consider "whether the public employee 'spoke as a citizen on a matter of public concern.'" *Bruce v. Worcester Reg'l Transit Auth.*, 34 F.4th 129, 135 (1st Cir. 2022) (quoting *Gilbert v. City of Chicopee*, 915 F.3d 74, 82 (1st Cir. 2019)). If so, it must consider whether "the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* (citations omitted). If the government entity did not have an adequate justification, the court must next assess whether "the protected expression was a substantial or motivating factor in the adverse employment decision." *Id.* (citations omitted). If the plaintiff can satisfy her burden at all three steps, the employer then "has the opportunity 'to prove by a preponderance of evidence that it would have reached the same decision regarding the adverse employment event even in the absence of the protected conduct.'" *McRae*, 106 F.4th at 133 (quoting *Stuart v. City of Framingham*, 989 F.3d 29, 35 (1st Cir. 2021)).

A.    <u>Whether Finton Spoke as a Citizen.</u>

Finton identifies two categories of speech that, she contends, led to her termination: (1) her advocacy for her students in the context of school meetings and communications with parents, and

(2) her speech in the context of the NEASC accreditation process. Invoking the first prong of the test, the defendants contend that Finton did not speak as a citizen with respect to either category.

To determine whether a public employee is speaking in connection with her employment or instead as a citizen, a court must consider the employee's job responsibilities and whether the speech at issue was made as part of those responsibilities. *See Decotiis v. Whittemore*, 635 F.3d 22, 30-33 (1st Cir. 2011); *Jakuttis v. Town of Dracut*, 656 F. Supp. 3d 302, 328 (D. Mass. 2023), *aff'd in relevant part*, 95 F.4th 22 (1st Cir. 2024). "'[T]he proper inquiry is practical rather than formal, focusing on the duties an employee actually is expected to perform,' and not merely those formally listed in the employee's job description." *Decotiis*, 635 F.3d at 31 (quoting *Mercado-Berrios v. Cancel-Alegria*, 611 F.3d 18, 26 (1st Cir. 2010)). Relevant factors may include:

> whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it "official significance"); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech.

*Gilbert*, 915 F.3d at 82 (quoting *Decotiis*, 635 F.3d at 32); *see also Bruce*, 34 F.4th at 136-37. Supervisor disapproval might also suggest the speech is protected. *Bruce*, 34 F.4th at 137 (citing *Dahlia v. Rodriquez*, 735 F.3d 1060, 1075 (9th Cir. 2013) (en banc)).

The first category of speech that Finton identifies—advocating for students in meetings and providing Bridge Program forms to one student's parents—was made pursuant to her responsibilities as a school adjustment counselor. School adjustment counselors are charged with, among other things, working with students with IEPs who struggle with social-emotional disabilities, providing mental health services, and engaging with interdisciplinary teams to assess student needs. ECF 57, ¶¶ 8-9. The record shows that not only were these Finton's official

responsibilities, but they were also the duties Finton was actually expected to perform. She was paid to speak up for students in meetings and work with parents of students with needs; some of her speech was made "up the chain of command" while at the school; the speech was made in her capacity as a school adjustment counselor; the speech derived from her specialized knowledge as a counselor; and there is no clear "citizen analogue." *Bruce*, 34 F.4th at 136-37. The only factor that arguably weighs in Finton's favor is that her supervisors disapproved of some of her advocacy—specifically, her provision of Bridge Program forms to parents without an initial consideration of their child's case at a coordination meeting. Assuming this qualifies as speech, supervisor disapproval is a single factor, and the fact that Finton's managers disapproved of this advocacy does not, without more, indicate that it fell outside the scope of her responsibilities. Finton's advocacy for students in the context of coordination meetings and with parents was not, accordingly, citizen speech protected by the First Amendment.

In contrast, a reasonable jury could conclude that Finton's speech in connection with the NEASC accreditation process—including her provision of data to the steering committee and her arranging of a meeting between disadvantaged students and NEASC—was done as a citizen rather than as part of her job duties. The record does not disclose whether Finton was paid for her work on the subcommittee, if it occurred outside of school hours, or if it was voluntary. The speech was not made up the chain of command in Falmouth High School, and there may be a citizen analogue to the coordination with students, insofar as a parent or other non-employee could have sought to arrange a meeting between NEASC and students. On the other hand, Finton's subcommittee was made up of Falmouth High School employees; it gave feedback and data to a steering committee that also comprised those employees; her speech seems to have been derived from her specialized knowledge as a counselor; and the subject matter of the speech related to her job, though not as

closely as the non-NEASC speech. The contextual factors here, therefore, point in different directions. Drawing all factual inferences in Finton's favor, a reasonable jury could conclude that Finton's advocacy for disadvantaged students during the NEASC accreditation process was undertaken as a citizen, rather than pursuant to her job duties. *Cf. Decotiis*, 635 F.3d at 32-35 (reversing grant of motion to dismiss where speech and language therapist spoke critically of a school with parents of children, where some contextual factors indicated citizen speech).

    B.    <u>Whether the Evidence Demonstrates a Causal Link Between Finton's NEASC Advocacy and an Adverse Employment Decision.</u>

At the hearing on the motion for summary judgment, in response to an inquiry from the Court,[7] the defendants contended that even if Finton's NEASC speech was citizen speech, her First Amendment claim fails at the third prong, because there is no evidence that her termination in October 2020 was causally related to her NEASC speech in April 2019. "Whether a plaintiff's protected speech was a 'substantial or motivating factor in [an] adverse employment decision . . . is simply a question of causation.'" *Salmon v. Lang*, 57 F.4th 296, 308 (1st Cir. 2022) (alterations in original) (quoting *Davignon v. Hodgson*, 524 F.3d 91, 106 (1st Cir. 2008)). The protected speech must have been the "but-for" cause of the adverse employment action; that is, "'the adverse action against the plaintiff would not have been taken absent the retaliatory motive.'" *Id.* at 312 (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)). Although a plaintiff may rely on circumstantial

---

[7] A district court may, with proper notice, issue judgment on grounds not raised by the parties' briefing so long as there has been enough time to conduct discovery on the issue and appropriate notice has been given to the parties. *Berkovitz v. Home Box Off., Inc.*, 89 F.3d 24, 29 (1st Cir. 1996). Here, fact discovery ended without any formal disputes. The Court raised the third prong, concerning causation, at the motion hearing and, since then, neither party has requested leave to file supplemental briefing or expressed misgivings about addressing the issue. Furthermore, the analysis here overlaps significantly with the causation analysis for other claims, *see infra*, which was briefed by both parties. The First Circuit recently concluded that summary judgment was appropriate under comparable circumstances. *McCoy v. Town of Pittsfield*, 59 F.4th 497, 503-05 (1st Cir. 2023).

evidence, the mere fact that one event followed another is not enough for a jury to infer causation absent a close temporal link. *Id.* at 312-13; *see also Ahern v. Shineski*, 629 F.3d 49, 58 (1st Cir. 2010) (in a Title VII case, "a gap of several months cannot alone ground an inference of a causal connection").

Finton has adduced no evidence demonstrating a causal link between her NEASC speech and her employment termination.[8] Her NEASC speech occurred in April 2019, during the 2018-2019 school year. Her termination happened in October 2020, during the 2020-2021 school year. In light of the 18-month gap between the NEASC speech and her termination, Finton cannot rely on temporal proximity to create an inference of causation. *See, e.g.*, *Delaney v. Town of Abington*, 890 F.3d 1, 8-9 (1st Cir. 2018) (seven months is too long to connect protected speech with alleged retaliation); *McGunigle v. City of Quincy*, 835 F.3d 192, 204 (1st Cir. 2016) (two years is too long); *González-Droz v. González-Colón*, 660 F.3d 1, 17 (1st Cir. 2011) (fourteen months is too long). And she has not pointed to any other record evidence—nor has the Court's review of the record uncovered any evidence—linking the NEASC speech to her termination. In between these events, several other events transpired, including Finton's request for a year-and-a-half of medical leave and her failure to respond to multiple requests from Falmouth Public Schools asking what reasonable modifications to her workplace would permit her to return for the 2020-2021 school year. On this record, no reasonable jury could conclude that Finton's NEASC speech was a

---

[8] Finton contended at the motion hearing that Gans's comment immediately following Finton's NEASC speech—Gans told Finton that the "entire English department hated" her for allowing the students to meet with members of NEASC, ECF 57, ¶ 127—should also be considered an adverse employment action. While the comment no doubt troubled Finton, "isolated 'comments by [a] supervisor that were critical of plaintiff's job performance' are 'without more . . . too trivial to deter a person of ordinary firmness from exercising First Amendment rights.'" *Delaney v. Town of Abington*, 890 F.3d 1, 8 (1st Cir. 2018) (alterations in original) (quoting *Barton v. Clancy*, 632 F.3d 9, 30 (1st Cir. 2011)).

substantial or motivating factor in Falmouth Public School's decision to terminate her employment. *See Delaney*, 890 F.3d at 9 ("Given that substantial passage of time, as well as the absence of any other supporting evidence of causation, we cannot conclude that [the plaintiff] has provided a sufficient basis from which a jury could reasonably conclude that there was a causal connection between his [protected speech] and the defendants' [adverse employment] decision."). The defendants are, accordingly, entitled to summary judgment on Finton's First Amendment claim.

## II.   <u>Disability Discrimination Claims.</u>

Finton asserts three theories of disability discrimination under the ADA and M.G.L. c. 151B, § 4(16): (1) a claim that the defendants fired her because of her status as a disabled person; (2) a claim that the defendants created a hostile work environment because of her status as a disabled person; and (3) a claim that the defendants failed to provide a reasonable accommodation for her disability. The Court addresses each claim in turn.

### A.   <u>Discriminatory Termination Claims.</u>

Finton first contends that the defendants terminated her employment because of her disability, in violation of the ADA and chapter 151B. The ADA prohibits an employer from discriminating against a qualified person with a disability with respect to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment" because of the disability. 42 U.S.C. § 12112(a). Chapter 151B similarly makes it unlawful for an employer "to dismiss from employment or refuse to hire, rehire or advance in employment or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless

the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business." M.G.L. c. 151B, § 4(16). Where, as here, any differences between the ADA and chapter 151B analysis are not material, the claims may be considered together. *See Brader v. Biogen Inc.*, 983 F.3d 39, 54 (1st Cir. 2020); *Wheatley v. American Tel. & Tel. Co.*, 418 Mass. 394, 397 (1994) ("It is our practice to apply Federal case law construing the Federal anti-discrimination statutes in interpreting G.L. c. 151B.").

In a case in which an employee has no direct evidence of animus based on disability, the court applies the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-07 (1973) to claims of disability discrimination. *Brader*, 983 F.3d at 54-55. At the first step, the plaintiff "bears the burden of showing a prima facie case of discrimination." *Miceli v. JetBlue Airways Corp.*, 914 F.3d 73, 81 (1st Cir. 2019); *Brader*, 983 F.3d at 55. If she makes her prima facie case, the burden shifts to the employer to "proffer a legitimate reason for terminating" the plaintiff. *Brader*, 983 F.3d at 55. If the employer makes that showing, the burden shifts back to the plaintiff to "'show by a preponderance of the evidence that [the employer's] proffered reason is pretextual and that the actual reason for the adverse employment action is discriminatory.'" *Id.* (quoting *Johnson v. Univ. of Puerto Rico*, 714 F.3d 48, 54 (1st Cir. 2013)).

The defendants contend that Finton has failed, as a matter of law, to make a prima facie case of disability discrimination. To make a prima facie case, Finton must establish that "(1) she suffers from a disability or handicap, as defined by the ADA; (2) she was nevertheless able to perform the essential functions of her job, either with or without reasonable accommodation; and (3) the defendant took an adverse employment action against her because of, in whole or in part, her protected disability." *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 99 n.7 (1st Cir.

2007). The defendants maintain that Finton has not brought forth any evidence as to the third prong—that is, the causation prong—showing that she was terminated from her job at Falmouth Public Schools because of her disability.

The defendants contend that the earliest they were made aware that Finton was suffering from a disability was September 23, 2019, when Finton forwarded to Dr. Santa the letter from Dr. Smith explaining that she had been diagnosed with acute situational stress disorder.[9] Further, they argue, they were not informed of Finton's other diagnoses of anxiety, PTSD, and GERD until after she had begun taking leaves of absence. And they insist that there is no evidence that her termination was because of her disabilities. For her part, Finton maintains, without citing anything in the record, that "the record is replete with evidence that Defendants viewed Ms. Finton as suffering from mental illness well before" September 23, 2019. ECF 66, at 9.

Whether or not Finton's symptoms of anxiety during the 2017-2018 and 2018-2019 school years should have put the defendants on notice that she was experiencing mental illness, Finton's discrimination claim falters because there is no evidence that she was terminated because of her disability. The only record evidence of disability-based animus that Finton identifies is Kazarian's testimony that, when another school adjustment counselor was on leave during the fall of 2018, it was "frustrating" to him that Finton was "feeling sad, depressed, anxious, [and] stressed." ECF 82, at 143-44. Kazarian further testified that "[i]t was frustrating to see [Finton] frustrated and it was frustrating just because of the situation of having one less counselor to help service our students." *Id.* During that same time period, Kazarian visited Finton's office for "Wellness Checks," and at

---

[9] The defendants separately contend that acute situational stress disorder is not a "disability" within the meaning of the ADA and chapter 151 because it is a temporary and situational, rather than a substantial, condition. The Court assumes, for the purposes of the case, that Finton's acute situational stress disorder diagnosis constitutes a "disability" under the ADA and chapter 151B.

times minimized her experiences, saying she was "ridiculous" and "emotional" when she objected to her increased workload. ECF 67, at 13, ¶¶ 6-7.

Even if this constitutes evidence of disability-based animus, there exists no causal connection between Kazarian's comments and subjective impressions in the fall of 2018 and Falmouth Public School's termination of Finton in October 2020. Nearly two years separates these events, and there is no evidence that Kazarian played any role in the school district's decision to terminate Finton's employment. Drawing all inferences in Finton's favor, no reasonable jury could conclude on this record that she lost her job at FPS "because of, in whole or in part, her protected disability." *Freadman*, 484 F.3d at 99 n.7. The defendants are, therefore, entitled to summary judgment on Friedman's first theory of disability discrimination under the ADA and chapter 151B.

B.    Hostile Work Environment Claims.

Finton's second theory of liability is that she was subjected to a hostile work environment by the defendants because of her disability. "[A] plaintiff may demonstrate an ADA violation by establishing that an employer required him or her to work in a hostile or abusive environment on account of their disability." *Brader*, 983 F.3d at 59. Following the First Circuit's lead, the Court assumes, without deciding, that a hostile work environment claim based on disability discrimination is likewise actionable under chapter 151B. *See Stratton v. Bentley Univ.*, 113 F.4th 25, 50 n.22 (1st Cir. 2024) ("'The SJC has not specifically confirmed that Massachusetts recognizes a claim for a hostile work environment based on handicap under ch. 151B, § 4(16).'" (quoting *Barton v. Clancy*, 632 F.3d 9, 20 n.7 (1st Cir. 2011))); *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 86 n.1 (1st Cir. 2016). To prevail on her hostile work environment claim under either statute, Finton "must show that (1) . . . she was a qualified individual with a disabilit[y]; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the

26

harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment; (5) the harassment was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and [Finton] in fact perceived it to be so; and (6) that some basis for employer liability has been established." *Stratton*, 113 F.4th at 50.

The defendants contend that Finton's claim fails as a matter of law because she lacks evidence that any harassment was based on her disability, and because no reasonable jury could conclude that she experienced harassment so severe or pervasive as to alter the conditions of her employment. The defendants again maintain that they were not informed that Finton had any disability until September 23, 2019, after all of the conduct that undergirds Finton's hostile work environment claim had taken place.

Bypassing the question whether the defendants may have had notice of Finton's disability due to her symptoms of anxiety during the 2017-2018 and 2018-2019 school years, the Court agrees that Finton cannot, as a matter of law, demonstrate severe or pervasive harassment. "To establish a hostile work environment, a plaintiff must show that her workplace was 'permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . [her] employment and create an abusive working environment.'" *Colón-Fontánez v. Municipality of San Juan*, 660 F.3d 17, 43 (1st Cir. 2011) (alterations modified) (quoting *Quiles-Quiles v. Henderson*, 439 F.3d 1, 7 (1st Cir. 2006)); *see Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993). Precedent "is clear that 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment' to establish an objectively hostile or abusive work environment." *Colón-Fontánez*, 660 F.3d at 44 (quoting *Faragher v. City of Boca Raton*, 524 U.S.

775, 788 (1998)). Similarly, "rudeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim." *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005).[10]

Drawing all factual inferences in Finton's favor, the evidentiary record does not demonstrate that she experienced severe or pervasive harassment objectively indicative of a hostile work environment.[11] From 2007 to 2011, Kazarian criticized Finton and was generally rude to her, but those early interactions are too attenuated to bear on her claim. In the fall of 2018, Kazarian told Finton that she was being "emotional" and "ridiculous" when she informed him that her workload was too high and that Gans refused to hire a substitute. ECF 67, at 13, ¶¶ 6-7. Later that year, in the spring of 2019, Gans told Finton that the English Department "hated" her for arranging a student meeting with NEASC, and barely spoke to Finton after the January 2019 grievance. ECF 57, ¶ 127; ECF 67, at 14, ¶ 10.

Over the course of three days in September 2019, Kazarian and Gans acted rudely towards Finton and reprimanded her. During two meetings on September 17, Kazarian waved his hands in the air, rolled his eyes, and yelled at Finton. ECF 57, ¶¶ 140-41. On September 18, he visited Finton's office and threatened to put her on a performance improvement plan if her attitude did

---

[10] The standard is similar under Massachusetts law. *See Gyulakian v. Lexus of Watertown, Inc.*, 475 Mass. 290, 296 (2016) (the conduct must be "both 'subjectively offensive' and 'sufficiently severe and pervasive to interfere with a reasonable person's work performance,'" and the environment must be "'pervaded by harassment or abuse,' resulting in 'intimidation, humiliation, and stigmatization' that poses a 'formidable barrier to the plaintiff's full participation in the workplace'" (quoting *Dahms v. Cognex Corp*. 455 Mass. 190, 205 (2009); *Pelletier v. Somerset*, 458 Mass. 504, 523-24 (2010))). Where the parties have not argued that the federal and state statutes create meaningfully different standards, the Court, like the First Circuit, will assume the standards are interchangeable in resolving the motion for summary judgment. *See, e.g.*, *Brader*, 983 F.3d at 59-65; *Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215-18, 215 n.9 (1st Cir. 2016); *Noviello*, 398 F.3d at 92-94.

[11] There is no dispute that Finton subjectively felt harassed and that the events at issue had detrimental effects on her mental health.

not improve, told her that she was making her co-workers uncomfortable, refused to leave despite being asked twice, and blocked the door with his hand on the door handle. *Id.* ¶ 142. The next day, during the weekly coordination meeting with Gans, he revealed that Finton had provided parents with Bridge Program forms before she was authorized to do so under school policy. *Id.* ¶ 143. At that same meeting, Gans became upset and reprimanded Finton in front of her colleagues for discussing the Bridge Program with the parents without administrative authorization. *Id.*

Considering the totality of the circumstances, these episodes do not amount to pervasive harassment. Gans and Kazarian's criticism of Finton was not a daily, or even regular, occurrence. Most of the criticism occurred over several days in September 2019, and the events of those days, taken together with Kazarian's general rudeness to Finton, do not amount to a pattern of harassment. Nor was the harassment severe. Kazarian's refusal to leave Finton's office could make an employee in Finton's situation uncomfortable, but it was not a physical threat, and it occurred during a meeting in which Kazarian was, however unartfully, giving Finton feedback as her supervisor. While the record portrays supervisors who were, at times, uncivil, their conduct— including rolled eyes, waved hands, insensitive rebukes, and occasional yelling—is not sufficient, absent greater frequency, to create a hostile work environment. Even though Gans and Kazarian's conduct impacted Finton's work performance, their conduct was "episodic, but not frequent, in nature; upsetting, but not severe; mildly humiliating, but not physically threatening." *Colón-Fontánez*, 660 F.3d at 44-45.

In cases with similar fact patterns, the First Circuit has affirmed summary judgment for the employer. *See, e.g.*, *Brader*, 983 F.3d at 62-63 (critiques by a supervisor that the plaintiff found unduly harsh are insufficient to create a hostile work environment); *Murray*, 821 F.3d at 87 ("snide comments" are insufficient to create a hostile work environment); *Alvarado v. Donahoe*, 687 F.3d

453, 462-63 (1st Cir. 2012) (isolated incidents of derogatory language, even when fairly severe, are insufficient to create a hostile work environment); *Colón-Fontánez*, 660 F.3d at 43-45 (employee who was yelled at by supervisor in front of co-workers and who was accused of "faking it" and being a hypochondriac was not subject to a hostile work environment). And the facts here do not resemble cases in which the First Circuit has concluded that summary judgment was not warranted. *See, e.g.*, *Gerald v. Univ. of Puerto Rico*, 707 F.3d 7, 18 (1st Cir. 2013) (harassment included unwanted physical contact); *Tang*, 821 F.3d at 218 (plaintiff was subjected to frequent obscene and degrading, rather than simply rude, comments); *Quiles-Quiles*, 439 F.3d at 3-4, 7 (harassment occurred on a daily basis and included lewd comments, and co-worker threateningly drove at the plaintiff with her truck); *Noviello*, 398 F.3d at 93-94 (plaintiff was subjected to false accusations of misconduct and continuing harassing insults, told by co-workers she had to take dinner breaks alone, left in the cold by co-workers, taunted with a collection on behalf of the employee she reported for sexual harassment, and put at risk of physical harm by a co-worker who came close to striking her with a car). The defendants are, accordingly, entitled to summary judgment on Finton's disability-based hostile work environment claims.

C.    Failure to Accommodate Claims.

Finton's third theory of liability is that the defendants violated the ADA and chapter 151B by failing to reasonably accommodate her disability. Both statutes create an obligation for employers to offer reasonable accommodations to disabled employees who request them. *See* 42 U.S.C. § 12112(b)(5)(A); M.G.L. c. 151B, § 4(16); *see also Murray*, 821 F.3d at 84; *Godfrey v. Globe Newspaper Co.*, 457 Mass. 113, 119-20 (2010). To prevail on a failure-to-accommodate claim under either statute, Finton "must show that: '(1) [s]he is disabled within the meaning of the [applicable statute], (2) [s]he was able to perform the essential functions of the job with or without

30

a reasonable accommodation, and (3) [the defendants], despite knowing of [Finton's] disability, did not reasonably accommodate it.'" *Stratton*, 113 F.4th at 52 (alterations modified) (quoting *Freadman*, 484 F.3d at 102); *see Alba v. Raytheon Co.*, 441 Mass. 836, 843 n.9 (2004) (same elements under Massachusetts law, but a plaintiff must also demonstrate harm from the failure to accommodate).

Focusing on the third element of the test, the defendants contend that Finton has failed to demonstrate that, despite knowing of her disability, they did not provide her with a reasonable accommodation. Before addressing that contention, the Court briefly outlines the contours of the parties' responsibilities in requesting and providing reasonable accommodations for known disabilities. It then considers the defendants' argument in the context of two time periods: (1) the period from the fall of 2017 to the end of December 2019, and (2) from January 2020 to October 2020.

1.    *The Duties to Request and Provide Reasonable Accommodations.*

Employers are liable under the ADA and chapter 151B for failing to reasonably accommodate employees' known disabilities. "Typically, an employer's obligation to make a reasonable accommodation arises only when an employee provides a 'sufficiently direct and specific' request for the needed accommodation." *Stratton*, 113 F.4th at 53 (quoting *Tobin v. Liberty Mut. Ins.*, 553 F.3d 121, 129 (1st Cir. 2009)). While some disabilities are obvious enough that no request for an accommodation is necessary, in most cases, "[t]he burden is on [the plaintiff] to demonstrate in the first instance what specific accommodations she needed and how those accommodations were connected to her ability to work." *Ortiz-Martinez v. Fresenius Health Partners, PR, LLC*, 853 F.3d 599, 605 (1st Cir. 2017); *accord Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination*, 441 Mass. 632, 649 (2004) (informal requests

might not constitute "adequate" requests for accommodations). "'The employer has no duty to divine the need for a special accommodation where the employee merely makes a mundane request for a change at the workplace,' or simply relies on the employer's general awareness of his need for accommodations where the purported conflict with a medical condition in particular situations is not obvious." *Murray*, 821 F.3d at 85 (quoting *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001)).

An employee's direct and specific request for a needed accommodation "sometimes creates 'a duty on the part of the employer to engage in an interactive process.'" *E.E.O.C. v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014) (footnote omitted) (quoting *Enica v. Principi*, 544 F.3d 328, 338 (1st Cir. 2008)); *see Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 457 (2002) (similar requirement under chapter 151B). This is meant to be a "meaningful dialogue," *Ortiz-Martinez*, 853 F.3d at 605, and the employer's failure to conduct an interactive process can be enough to establish a discrimination claim, *see Kohl's*, 774 F.3d at 132. But refusal to give a specific accommodation is not necessarily evidence of bad faith on the employer's part, "so long as the employer makes an earnest attempt to discuss other potential reasonable accommodations." *Id.* at 133. The contours of the interactive process are determined by what the employer knows, which is, in turn, usually determined by the specificity of the request made by the employee. *See Kvorjak v. Maine*, 259 F.3d 48, 53-54 (1st Cir. 2001) (in an ADA case, where employer was not aware that a disability created limitations beyond commuting, it had no duty to offer accommodations unrelated to commuting); *Russell*, 437 Mass. at 457-58 (in a chapter 151B case, an employer had no duty to offer an accommodation that was not requested).

If the plaintiff cannot establish that the accommodation she requested was reasonable, the employer cannot be liable for a failure to engage in the interactive process. *See Trahan v. Wayfair*

*Maine, LLC*, 957 F.3d 54, 67 (1st Cir. 2020); *Echevarría v. AstraZeneca Pharm. LP*, 856 F.3d 119, 133 (1st Cir. 2017). To show that a requested accommodation is reasonable, the plaintiff must show that it "would enable her to perform the essential functions of her job" and that "on the face of things, it is feasible for the employer under the circumstances." *Reed*, 244 F.3d at 259; *accord Echevarría*, 856 F.3d at 127; *Barbuto v. Advantage Sales & Mktg., LLC*, 477 Mass. 456, 462 (2017) (quoting *Reed*, 244 F.3d at 259). While this analysis must be individualized and particular to the plaintiff's circumstances, the case law offers rules of thumb. *See Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 23 (1st Cir. 2004). "Typically, reasonable accommodations include such things as job restructuring, modified work schedules, reassignment to *vacant* positions, and the like." *Trahan*, 957 F.3d at 65 (emphasis added). In contrast, indefinite or permanent leaves of absence are rarely reasonable. *See Sarkisian v. Austin Preparatory Sch.*, 85 F.4th 670, 675-76 (1st Cir. 2023) (indefinite leave is not a reasonable accommodation for a teacher); *Echevarría*, 856 F.3d at 127 (indefinite leave is not a reasonable accommodation); *Russell*, 437 Mass. at 455 (indefinite leave is not a reasonable accommodation under chapter 151B). If the plaintiff requests a transfer as a reasonable accommodation, she "must demonstrate that there is an actual vacant position to which she can transfer." *Audette v. Town of Plymouth*, 858 F.3d 13, 20-21 (1st Cir. 2017); *see Godfrey*, 457 Mass. at 124 ("Neither elimination of an essential duty from a position nor assignment to an unrelated position are 'reasonable accommodations' within the meaning of G.L. c. 151B, §1.").

2.     *Requested Accommodations Through 2019.*

Against the backdrop of this case law, Finton contends that from the 2017-2018 school year until her termination, the defendants failed to offer reasonable accommodations at every turn.

Without citing anything in the record, she insists that "[e]very proposal for accommodation" she made was refused by the defendants. ECF 66, at 10.

No reasonable jury could concur with that assessment. Drawing all factual inferences in Finton's favor, the record is clear that, at least before September 23, 2019, she did not make a "sufficiently direct and specific request" for an accommodation so as to put the defendants on notice that she suffered from a disability and would require a reasonable accommodation. *Stratton*, 113 F.4th at 53 (quotation marks omitted). The first time that Finton alerted the defendants to any medical diagnosis was on September 23, 2019, when she sent Dr. Santa the note from Dr. Smith informing the defendants that Finton had been "diagnosed with acute situational stress disorder." ECF 57, ¶¶ 145, 150-51. Before that time, Finton had made generalized requests for workplace accommodations—as when she requested, and was granted, an 80% schedule in the fall of 2017, and as when Falmouth Public Schools hired a substitute school adjustment counselor in April 2019 in response to her union grievance. *See* ECF 57-1, at 5; ECF 67, at 13-14, ¶¶ 3, 10. But there is no evidence that these requests for a reduction in workload were tied to any particular disability. *See Reed*, 244 F.3d at 261 ("At the least, the request must explain how the accommodation requested is linked to some disability."). Thus, the defendants did not, during this period, have notice that Finton needed an accommodation for any disability. *See Stratton*, 113 F.4th at 53 (the employer "had no duty to divine the need for a special accommodation based on [the employee's] general request for a reduced workload" (quotation marks omitted)); *Estades-Negroni v. Assocs. Corp. of N. Am.*, 377 F.3d 58, 64 (1st Cir. 2004) (rejecting failure-to-accommodate claim where the plaintiff's general request for a reduced workload was not tied to her disability).

The parties dispute whether Dr. Smith's note, provided to the defendants on September 23, together with Finton's subsequent exchanges with Dr. Santa, amounted to requests for an

accommodation or satisfied the requirements of an interactive dialogue. The Court need not resolve these disagreements. Even assuming that the September 23 note put the defendants on notice that Finton was requesting a reasonable accommodation for her acute situational stress disorder, the defendants gave her the accommodation she requested: namely, a transfer to another school. Immediately following Finton's meeting with Dr. Santa and others on September 23, 2019, the defendants allowed Finton to work at the Morse Pond School temporarily while they investigated her allegations of harassment. ECF 57, ¶ 149. Then, in late October 2019, when her return date to Falmouth High School was approaching, Finton sent Dr. Santa another note from Dr. Smith saying that she could not, at that time, interact with her co-workers and supervisors "involved in the current investigation," and that such interactions were causing her chest pain, insomnia, and panic attacks. *Id.* ¶¶ 165, 168-69. In response, Dr. Santa agreed with Finton's request, made on October 22, 2019, that she continue working in a different building while her appeal was pending, and Finton was permitted to keep working at the Morse Pond School through December 2019. *Id.* ¶¶ 162, 171, 173-74. Thus, to the extent Finton requested an accommodation for her situational stress disorder, she was granted that accommodation by the defendants through the end of 2019.

3.    *Requested Accommodations During 2020.*

With the end of Finton's temporary transfer to the Morse Pond School approaching, Finton's counsel sent the defendants a letter, framed as a proposal to settle her harassment claim, on November 26, 2019. *Id.* ¶¶ 177-80; ECF 72-13, at 1. The parties again dispute whether this letter qualified as a request for an accommodation tied to a known disability. Even assuming it was sufficiently tied to Finton's situational stress disorder diagnosis, no reasonable jury could conclude that the accommodations requested in the letter were reasonable. In the letter, Finton

proposed that the school district create a new position for her, titled Director of Social Emotional Learning, that would commence on January 1, 2020, and would be located in the central district office, not Falmouth High School. ECF 72-13, at 4. She requested 3-5 sessions in which she could enter Falmouth High School with a support person, and during which time none of the people named in her harassment complaint—including Gans and Kazarian—could be in the building. *Id.* at 5. She further requested an additional 3-6 mediation session with Gans and Kazarian after her 3-5 sessions entering Falmouth High School. *Id.* But she specified that during the mediations and thereafter, she could have "no direct communication" with Kazarian; rather, in "mutual meetings, [Kazarian] would be required to sit at the opposite side of the table from [Finton] and speak directly to her only when others are present." *Id.* She also requested that she never "attend student meetings with just" her and Kazarian. *Id.* Finally, she requested that Falmouth High School open the Wellness Center and staff it with two full-time employees. *Id.* at 6.

"[A] plaintiff must show, even at the summary-judgment stage, that the requested accommodation is facially reasonable"—that is, the requested accommodation "is feasible for the employer under the circumstances." *Echevarría*, 856 F.3d at 127-28. No reasonable jury could conclude that Finton's November 26, 2019 requests were feasible for the school district under the circumstances. Setting aside the requests related to the Wellness Center, which do not appear to be tied to her situational stress disorder diagnosis, Finton was requesting not only a transfer to the central office, but the creation of a new position altogether. The case law is clear that, in fashioning reasonable accommodations, an employer need not create a new position for an employee. *See Phelps v. Optima Health, Inc.*, 251 F.3d 21, 27 (1st Cir. 2001) ("An employer is not required by the ADA to create a new job for an employee, nor to re-establish a position that no longer exists."); *Russell*, 437 Mass. at 454 (the employer "was under no obligation to create a new position for the

plaintiff" under chapter 151B). Nor has Finton made any showing that her request to never speak directly to Kazarian, her direct supervisor, again—including in the 3-6 mediation sessions with him that she also requested—was feasible.

When the school district set a January 6, 2020 date for Finton's return to her position at Falmouth High School, Finton commenced a period of leave under the FMLA. When that leave ran out, Finton requested medical leave until August 20, 2020. ECF 57, ¶ 198. The school district agreed in part, granting Finton unpaid medical leave until June 26, 2020. *Id.* ¶¶ 200-01. The Superintendent's letter to Finton explained that "the District must plan and prepare for having sufficient staff to serve the counseling needs of our students during the 2020-2021 school year." *Id.* ¶ 200; ECF 72-18. "To that end," the letter continued, Finton must "provide documentation from your health care provider about your readiness to return to work and any accommodations they believe you would need so that I can evaluate the situation at the start of the summer in order to meet the needs of our students in the next school year." ECF 57, ¶ 200; ECF 72-18.

On June 19, 2020 and July 24, 2020, Dr. Smith and Finton's counsel wrote to Falmouth Public Schools to state that, due to Finton's PTSD and situational anxiety disorder, she could not "be in the presence of her supervisors either in the workplace or remotely," and would "be unable to return to her position for the 2020-2021 school year." ECF 57, ¶¶ 204, 208. And on August 13, 2020, Finton's counsel wrote to ask whether Finton could be transferred to another school, or whether a "modification that would keep her from being exposed to Principal Gans and Mr. Kazarian" was possible. *Id.* ¶ 213. Finton has offered no argument as to why these accommodation requests were feasible for the defendants. Where there is no basis in the record to infer that Finton would return on a date certain, or that a temporary worker was available to fill her school adjustment counselor position during the 2020-2021 school year, her request for a leave of absence

lasting an entire school year, when she had already been on leave since January 2020, is not facially reasonable. *See Sarkisian*, 85 F.4th at 675-76; *Echevarría*, 856 F.3d at 127. Similarly, where Finton has offered no evidence that there was a vacant school adjustment counselor, guidance counselor, or comparable position available within Falmouth Public Schools, she has not met her burden on summary judgment to show the facial reasonableness of her request for a transfer. *See Audette*, 858 F.3d at 20-21 (to survive summary judgment, a plaintiff "must demonstrate that there is an actual vacant position to which she can transfer"). And Finton likewise offers no argument as to how it would be feasible for her to work at Falmouth High School without encountering the Principal or Director of Guidance at the school, where it is undisputed that school adjustment counselors must work collaboratively with other school staff, including at coordination meetings, as an essential function of their job. *Cf. Trahan*, 957 F.3d at 66-67 (requested accommodation of working from home and less contact with co-workers was unreasonable in a team-oriented workplace).

Finton has, accordingly, failed to demonstrate that any of her accommodation requests in 2020 were facially reasonable. The defendants are therefore entitled to summary judgment on her failure-to-accommodate claim. *See Echevarría*, 856 F.3d at 128 ("[W]here a plaintiff fails to show facial reasonableness, summary judgment for the defendant is appropriate.").

## III.   **Retaliation Claims.**

Finton separately asserts claims of retaliation under the ADA, Section 504 of the Rehabilitation Act, and M.G.L. c. 151B, § 4(4). She contends that after she engaged in protected conduct, the defendants retaliated against her by (1) creating a hostile work environment and (2) terminating her employment.

The ADA, chapter 151B, and Section 504, via its implementing regulations, prohibit employers from taking an adverse employment action in response to an employee's protected conduct. *See* 42 U.S.C. § 12203; M.G.L. c. 151B, § 4(4); 29 U.S.C. § 794; 28 C.F.R. § 42.503(b)(1)(vii).[12] "Retaliation claims under the ADA, Section 504, and Chapter 151B are analyzed under the same three-element framework: (1) the plaintiff engaged in protected conduct; (2) the plaintiff experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." *Rae v. Woburn Pub. Schools*, 113 F.4th 86, 100 (1st Cir. 2024) (citing cases).

Finton identifies "reporting to her employer that special education students were not receiving all their required services and that the school failed to have systems in place to manage students with mental health issues" as her protected conduct. ECF 66, at 7. Although Finton does not identify when she engaged in this conduct, the Court understands Finton to refer to the statements she made in the January 2019 union grievance, the August 2019 meeting with Superintendent Duerr, and the September 2019 coordination meetings at Falmouth Public School.[13] "[A]dvocating on behalf of people with disabilities—including protecting students' right 'to be free from disability-based discrimination'—'plainly constitutes protected conduct' under the ADA and Section 504." *Rae*, 113 F.4th at 100 (quoting *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 41 (1st Cir. 2012)). And, in view of the "broad anti-retaliation" provision in chapter 151B "that generally parallels federal protections," Massachusetts law likely also considers

---

[12] Section 504 applies to entities that receive federal funds, not to all employers. 29 U.S.C. § 794(a). It is undisputed that Falmouth Public Schools receives federal funds and is a proper defendant.

[13] The defendants argue that because the January 2019 grievance was a union grievance, the retaliation claim is preempted by the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* Because Finton engaged in other, non-union advocacy for students with disabilities, and the retaliation claims fail on other grounds, the Court declines to consider the preemption argument.

advocating on behalf of the rights of students with disabilities to be protected conduct. *Id.* (citing M.G.L. c. 151B, § 4(4)).

The defendants contend, and the Court agrees, that to the extent Finton premises her retaliation claims on a hostile work environment theory, the claims fail at the second element because Finton did not experience an adverse employment action. The First Circuit recently recognized, in the ADA context, that "'a hostile work environment, tolerated by the employer, is cognizable as a retaliatory adverse employment action' if the harassment is 'sufficiently severe or pervasive.'" *Rae*, 113 F.4th at 101 (quoting *Noviello*, 398 F.3d at 89).[14] And it has also made clear that the "severe-or-pervasive" harassment standard is the same in the context of discriminatory hostile work environment and retaliatory hostile work environment claims. *See, e.g.*, *id.* at 108 n.7 ("the same 'severe or pervasive' harassment standard [is] applicable to the adverse employment action element of a retaliatory harassment claim" and to a "standalone hostile work environment claim" (citing *Noviello*, 398 F.3d at 89)); *Colón-Fontánez*, 660 F.3d at 43-44 (relying on case law interpreting the "severe-or-pervasive" standard in Title VII cases to describe the standard in an ADA retaliatory harassment case). Finton points to the same conduct to support her discriminatory hostile work environment and retaliatory hostile work environment claims. For the reasons already explained, no reasonable jury could conclude that the defendants subjected Finton to a hostile work

_____

[14] One week before *Rae* was decided, the First Circuit cautioned in *Stratton* that, in the Title VII context, a court assessing whether harassment constitutes a "materially adverse" employment action must analyze whether the harassment "'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" 113 F.4th at 42 (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). And it took "the opportunity . . . to say, definitively, that *Noviello*'s standard in the retaliation context is no longer appropriate." *Id.* at 43. Because *Rae* was decided after *Stratton*, the Court understands the First Circuit to have drawn a distinction between the standard applicable to retaliatory harassment claims in the Title VII and ADA contexts. But even under *Stratton*'s "might-have-dissuaded" standard, drawn from *Burlington Northern*, the totality of the harassing conduct that Finton identifies would not have dissuaded a reasonable worker from advocating for the rights of students with disabilities.

environment, even when considering all of the events from the fall of 2017 to the fall of 2019, including those events that predated some of her protected conduct. Finton did not, accordingly, experience a "materially adverse" action in the form of a hostile work environment, and the defendants are entitled to summary judgment on her retaliatory hostile work environment claims.

The defendants next contend, and the Court agrees, that to the extent Finton premises her retaliation claims on her termination, the claims fail at the third element for lack of a causal nexus. Termination from one's job is, unquestionably, a materially adverse employment action. But to meet her burden at summary judgment, Finton must show that a reasonable jury could conclude that her "protected activity was the but-for cause of" her termination. *Rae*, 113 F.4th at 101. Finton's protected advocacy for the rights of students with disabilities occurred in January 2019, through her union grievance; in August 2019, in her meeting with superintendent Duerr; and in September 2019, when she spoke up in a coordination meeting to defend her provision of Bridge Program forms to a student's parents. At best, this protected conduct occurred thirteen months before Finton's October 2020 termination from Falmouth Public Schools. Thus, as with her First Amendment retaliation claim, Finton cannot rely on temporal proximity to suggest that her firing was caused by her protected advocacy on behalf of students with disabilities. *See Rae*, 113 F.4th at 101 ("'One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action.'" (quoting *Wyatt v. City of Boston*, 35 F.3d 13, 16 (1st Cir. 1994))). And, as with her First Amendment claim, Finton has not pointed to evidence that she lost her job because of her choice to speak up for the rights of students with disabilities. In the nine months before her termination, Finton had been on leave and had ignored a series of requests from Falmouth Public Schools to identify reasonable accommodations that would allow her to return to her job in the 2020-2021 school year. Absent constructive

discharge, a plaintiff cannot simply stop working and satisfy the causal element of a retaliation claim. *Cf. Alston v. Town of Brookline*, 997 F.3d 23, 49-50 (1st Cir. 2021) (a plaintiff terminated after running out of leave cannot survive summary judgment by claiming the termination was causally related to his protected conduct).

The defendants are, accordingly, entitled to summary judgment on Finton's claims under the ADA, the Rehabilitation Act, and M.G.L. c. 151B, § 4(4) for retaliatory harassment and retaliatory termination.

## IV.    **Wrongful Termination Claim.**

Finton's final claim asserts that she was wrongfully terminated by Falmouth Public Schools in violation of public policy. Her complaint alleges that, advancing the "public policy embodied in M.G.L. c. 151B," she "advocated for minority students and students with disabilities and opposed discriminatory practices against students," and was fired from her job because of that advocacy. ECF 1, ¶¶ 106-08. Falmouth Public Schools contends that this claim fails as a matter of law because, under Massachusetts law, chapter 151B's comprehensive remedial scheme displaces any such common law cause of action for wrongful termination.

In Massachusetts, employment is presumed to be at will. *Meehan v. Med. Inf. Tech., Inc.*, 488 Mass. 730, 732 (2021). At will employment can generally "be terminated for any reason or for no reason." *Harrison v. NetCentric Corp.*, 433 Mass. 465, 478 (2001). The "public policy exception" to this rule, however, protects employees who are terminated for "asserting a legally guaranteed right," "doing what the law requires," "refusing to do what which the law forbids," and "performing important public deeds, even though the law does not absolutely require the performance of such a deed." *Meehan*, 488 Mass. at 733 (citations omitted). While this doctrine is "narrow," it allows an employee to advance a wrongful discharge claim if her conduct falls into

42

one of the recognized categories. *Osborne-Trussell v. Children's Hosp. Corp.*, 488 Mass. 248, 265 (2021). In Finton's view, her advocacy for her minority students and students with disabilities meets that standard.

Falmouth Public Schools does not take issue with whether Finton's advocacy for students falls within the public policy exception. Instead, it invokes another line of Massachusetts cases holding that courts may not recognize common law remedies when the Legislature has already provided remedies in a "comprehensive legislative scheme [like] G.L. c. 151B." *Melley v. Gillette Corp.*, 19 Mass. App. Ct. 511, 512 (1985); *see also Valerio v. Putnam Assocs. Inc.*, 173 F.3d 35, 45-46 (1st Cir. 1999); *Perez v. Greater New Bedford Vocational Tech. Sch. Dist.*, 988 F. Supp. 2d 105, 113 (D. Mass. 2013); *Ourfalian v. Aro Mfg. Co., Inc.*, 31 Mass. App. Ct. 294, 296 (1991); *Cappucci v. Boston Univ.*, 70 Mass. App. Ct. 1102, at *3 (2007) (Rule 1:28 decision). "The rationale for implying a private remedy under the 'public policy exception' to the traditional rule governing at-will employment contracts," the Appeals Court explained, "is that, unless a remedy is recognized, there is no other way to vindicate such public policy." *Melley*, 19 Mass. App. Ct. at 511-12. But where there already exists a "comprehensive remedial statute, the creation of a new common law action based on the public policy expressed in that statute would interfere with that remedial scheme." *Id.* at 513. Falmouth Public Schools argues that, to the extent Finton alleges that she was unlawfully terminated because of her advocacy for minority students and students with disabilities, chapter 151B provides the appropriate remedy.

Accordingly, under Massachusetts law, Finton can avail herself of the public policy exception to the at-will employment doctrine only to the extent her advocacy is not protected by chapter 151B. *See Cappucci*, 70 Mass. App. Ct. 1102, at *3. She concedes that because chapter 151B affords a remedy for an unlawful termination based on a teacher's advocacy for students

with disabilities—in the form of a retaliatory termination claim, previously discussed—she may not advance a common law wrongful discharge claim. ECF 66, at 11. But she offers no argument on why chapter 151B would not also afford a remedy for an unlawful termination based on a teacher's advocacy for students of color, likewise in the form of a retaliatory termination claim.

The Court concludes that chapter 151B would provide such a remedy. The Supreme Judicial Court has long recognized that chapter 151B is a "comprehensive statute enacted to provide judicial and administrative remedies for destructive acts of discrimination in the workplace." *Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 391-92 (2005). It provides broad protections against discrimination on the basis of, among other things, race and disability. *See* M.G.L. c. 151B, §§ 4(1), 4(16). It "contains a broad anti-retaliation clause that generally parallels federal protections." *Rae*, 113 F.4th at 100; *see* M.G.L. c. 151B, § 4(4). And the Legislature specifically directed that the chapter "shall be construed liberally for the accomplishment of its purposes." M.G.L. c. 151B, § 9. In line with that instruction, the Supreme Judicial Court interprets the language in chapter 151B "broadly in light of its remedial purpose, and in order best to effectuate the Legislature's intent." *Flagg v. AliMed, Inc.*, 466 Mass. 23, 30-33 (2013) (recognizing the viability of associational discrimination claims in certain contexts, "despite a lack of a specific reference in the statutory language").

Even absent a Massachusetts case directly on point, the First Circuit has repeatedly concluded that advocating on behalf of the rights of people with disabilities, including students, constitutes protected conduct under chapter 151B's bar against workplace retaliation. *See Rae*, 113 F.4th at 100; *D.B.*, 675 F.3d at 41. The same logic leads to the conclusion that advocating on behalf of the rights of students of color likewise constitutes protected conduct under chapter 151B's bar against workplace retaliation. *Cf. Persson v. Boston Univ.*, No. 15-cv-14037-JGD, 2019 WL

44

917205, at *14 (D. Mass. Feb. 25, 2019), *aff'd*, No. 19-1279 (1st Cir. Sept. 9, 2020) (allegations that a white employee advocated against a racial pay disparity and was punished for doing so were analyzed under Title VII's anti-retaliation provision). Because chapter 151B's "comprehensive legislative scheme" would afford a remedy for Finton's contention that she was unlawfully terminated from her job in retaliation for her advocacy for the rights of students of color and students with disabilities, she cannot seek redress for the same conduct through a common law wrongful discharge claim. *Melley*, 19 Mass. App. Ct. at 512-13.[15] Falmouth Public Schools is, accordingly, entitled to summary judgment on the claim.

## CONCLUSION AND ORDER

For the foregoing reasons, the defendants' motion for summary judgment, ECF 55, is GRANTED.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated:  September 27, 2024

---

[15] Finton argued in her opposition brief that her wrongful termination claim was also founded upon her advocacy for economically disadvantaged students. ECF 66, at 11-12. But that theory was not alleged in her complaint, and "[p]laintiffs may not 'raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment.'" *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 76 (1st Cir. 2016) (quoting *Calvi v. Knox Cty.*, 470 F.3d 422, 431 (1st Cir. 2006)).